# In the United States Court of Federal Claims

| | |
|---|---|
| MICHAEL E. KELLY, *et al.*, | |
| *Plaintiffs,* | No. 21-1949 L |
| v. | (Filed: May 8, 2024) |
| THE UNITED STATES, | |
| *Defendant.* | |

Allan B. Diamond, Houston, TX, for plaintiffs.

Anthony F. Schiavetti, Civil Division, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**
Granting the Government's Motion to Dismiss the Amended Complaint

**SILFEN,** *Judge.*

  Michael E. Kelly, along with a bank holding company, nine bank subsidiaries, and one non-bank subsidiary, each of which he controls (collectively "Mr. Kelly"), seeks compensation under the Takings Clause of the Fifth Amendment. Mr. Kelly alleges that the government took his stock interests when two government-sponsored enterprises, Fannie Mae and Freddie Mac, were placed into conservatorships during the 2008 financial crisis. The government moves to dismiss the amended complaint for lack of jurisdiction and for failure to state a claim, arguing that Mr. Kelly's claims are barred by this court's statute of limitations. Mr. Kelly argues that this court has jurisdiction because the Tucker Act's statute of limitations was tolled during a related putative class action, *Washington Federal v. United States*, 149 Fed. Cl. 281 (2020), *aff'd*, 26 F.4th 1253 (Fed. Cir. 2022).

  The government further argues that Mr. Kelly's suit is precluded by the Federal Circuit's decision in *Washington Federal*, and Mr. Kelly responds that *Washington Federal* was different enough to not preclude his claims here. But *Washington Federal* has put Mr. Kelly in a bind. He would like his complaint to be similar enough to that in *Washington Federal* to warrant tolling, yet different enough to avoid any preclusion based on the Federal Circuit's decision in that case. That is too fine a line for him to walk. His claims are time barred because the statute of limitations, which is jurisdictional, cannot be tolled. And even if his complaint were timely, it fails to state a claim because *Washington Federal* and other binding Federal Circuit decisions have already

1

decided the issues in this case. This court therefore **grants** the government's motion and **dismisses** Mr. Kelly's amended complaint.

I.     Background

Congress created the government-sponsored enterprises, Fannie Mae and Freddie Mac, "to provide increased liquidity and stability to the security mortgage market by securitizing mortgage-backed securities." ECF No. 30 at 7-8 [¶¶24-25]; ECF No. 31 at 4.[1] The enterprises purchase mortgages, consolidate them into mortgage-backed securities, and then sell those securities to investors. *Collins v. Yellen*, 141 S. Ct. 1761, 1771 (2021). The enterprises raise funds from the market by issuing stock shares. ECF No. 30 at 8 [¶26]. This process alleviates mortgage lenders' risk of default and makes investors' money available to give out more loans. *Collins*, 141 S. Ct. at 1771. Operating as private, for-profit companies, the enterprises were publicly traded on the New York Stock Exchange until June 2010. ECF No. 30 at 7-8 [¶¶24-25]. But as congressionally chartered institutions, they benefited from the widespread perception that the federal government guaranteed their success and would step in if they experienced any financial hardship. *Washington Federal v. United States*, 26 F.4th 1253, 1260 (Fed. Cir. 2022); *see also* ECF No. 30 at 12 [¶¶38-39].

Given their distinctive status, the enterprises can "purchase more mortgages and mortgage-backed securities at cheaper rates than would otherwise prevail in the private market." *Washington Federal*, 26 F.4th at 1260. One type of share the enterprises issue is preferred stock; preferred stocks have unique rights and benefits that are distinct from and superior to common stocks. ECF No. 30 at 8 [¶27], 30-31 [¶¶98-99]. For example, preferred stock shareholders have a right to receive a portion of the company's assets if the company is dissolved and have priority in receiving dividend payments. *Id.*

In the early 1980s, Mr. Kelly acquired and became president and CEO of First Bank of Oak Park (FBOP). ECF No. 30 at 6 [¶18]. The bank grew to become a large multi-bank holding company with nine subsidiaries. *Id.* at 6-7 [¶20]. By the early 2000s, FBOP was the largest privately held bank holding company in the country. *Id.* at 7 [¶20]. The bank and its subsidiaries collectively owned $19.4 billion in assets. *Id.*

In 2006, the Office of Federal Housing Enterprise Oversight, the enterprises' chief regulator, increased the enterprises' capital requirements, forcing the enterprises to issue additional preferred stocks. ECF No. 30 at 9 [¶32]. The government therefore added strong incentives for banks to invest in the enterprises. *Id.* at 9-10 [¶¶33-34]. Banks were permitted to invest up to 100% of their tier one capital in the enterprises' preferred shares. *Id.* at 10 [¶36]. Tier one capital is a bank's core capital, the "minimum adequate funds determined to be needed by a bank to function on a regular basis." *Id.* at 10-11 [¶36]. This was a significant change; typically, a bank could invest at most 10% of its tier one capital in those types of shares. *Id.* at 10-11 [¶¶36-37].

---

[1] For purposes of this motion, the court accepts the allegations in Mr. Kelly's complaint as true. *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

In late 2007 and early 2008, Mr. Kelly bought the enterprises' preferred stocks, enough to give him a total of approximately $898 million in those preferred stocks. ECF No. 30 at 14 [¶46]. That investment was a substantial percentage of Mr. Kelly's tier one capital. *Id.* at 17 [¶50].

### A. The 2008 financial crisis and the conservatorships

As the financial crisis loomed, Congress enacted the Housing and Economic Recovery Act, 12 U.S.C. §§ 4501-4642. ECF No. 30 at 20 [¶61]. The statute created the Federal Housing Finance Agency (FHFA) and gave it both supervisory and regulatory authority over the enterprises. 12 U.S.C. § 4511. Congress gave the FHFA discretion to appoint itself as conservator or receiver over the enterprises and specified the ways in which it could do that. 12 U.S.C. § 4617(a)(1)-(a)(3). The statute also included a judicial review provision for the enterprises to challenge the creation of a conservatorship or receivership in district court. *Id.* at (a)(5).

When the housing bubble burst, the enterprises suffered a massive loss. *See Collins*, 141 S. Ct. at 1771. On September 6, 2008, the FHFA exercised its authority under the Recovery Act and placed the enterprises into conservatorships. ECF No. 30 at 20 [¶63]. The board of directors for each enterprise consented to the conservatorship. *Washington Federal*, 149 Fed. Cl. at 287; *see also* ECF No. 30 at 22-23 [¶¶69-70] (asserting that the government "directed" the boards to consent, and otherwise the government "would seize them").

The next day, the FHFA entered into senior preferred stock purchase agreements with the Treasury Department to help keep the enterprises afloat. ECF No. 30 at 28 [¶89]. Under the agreements, Treasury agreed to invest billions of dollars for one billion dollars' worth of senior preferred shares in the enterprises. *Id.* Under the agreements, the FHFA gave Treasury exclusive control over the conservatorships. *Id.* at 28 [¶90].

The day after that, the value of the enterprises' preferred shares nosedived. ECF No. 30 at 31 [¶101]. Like countless others who had invested a large percentage of their tier one capital in the enterprises' preferred shares, Mr. Kelly lost substantial stock value. *Id.* at 31 [¶101] (FBOP lost $885 million); *id.* at 35 [¶114] (Mr. Kelly's tier one capital shares diminished by more than 98%). For Mr. Kelly this meant that seven of the nine FBOP subsidiaries had insufficient tier one capital to meet regulatory requirements, so the government placed them into receiverships. ECF No. 30 at 35 [¶114], 39 [¶127]. The remaining two subsidiaries were also put in receiverships under the government's cross-guaranty authority. *Id.* at 39 [¶128]. By the end of 2008, FBOP became insolvent and was forced to liquidate its assets. *Id.* at 40 [¶132]. Ultimately Mr. Kelly alleges that he lost $19.4 billion in combined assets, nearly his entire net worth. *Id.* at 42 [¶¶136-37].

### B. *Washington Federal*

On June 10, 2013, some enterprise shareholders filed a putative class-action lawsuit, on behalf of themselves and others similarly situated, alleging that "the United States has expropriated all of their economic interests in Fannie and Freddie stock, along with any other property rights they had in their stock" by taking the enterprises into conservatorships and entering into agreements to purchase the enterprises' preferred stock. *Washington Federal*, 149 Fed. Cl. at 288. The plaintiffs asserted that the conservatorships constituted a Fifth Amendment taking or, in the alternative, an illegal exaction of their property interests in their stock holdings. *Id.* at 288-89.

3

This court ultimately dismissed *Washington Federal*, holding that the plaintiffs lacked standing to allege direct takings claims (149 Fed. Cl. at 292-97), and on February 22, 2022, the Federal Circuit affirmed (26 F.4th at 1270). Although the *Washington Federal* plaintiffs pleaded their claims as direct takings, the Federal Circuit agreed with this court's determination that the claims were in fact substantially derivative in nature, and that the plaintiffs lacked standing to litigate those third-party claims as direct claims. 26 F.4th at 1267-68; *see* 149 Fed. Cl. at 292, 294.

The Federal Circuit explained that, under the "so-called shareholder standing rule," injured shareholders may not bring a direct action to enforce the rights of the corporation; only the corporation may bring such a claim. *Washington Federal*, 26 F.4th at 1267. The plaintiffs' allegation that the government violated their shareholder rights "depend[s] on an alleged injury to the Enterprises." *Id.* at 1268; *see also id.* at 1269; 149 Fed. Cl at 294-95. As third parties, the *Washington Federal* plaintiffs did not have standing under the "prudential standing" doctrine and could not bring a direct takings claim. *Id.* at 1267-70; *see* 149 Fed. Cl at 294-95. They had at most a derivative action. *Id.*

The Federal Circuit further explained that shareholders, like the *Washington Federal* plaintiffs, may bring derivative actions, but only in the "extreme circumstances" that the enterprises' management "refuse[s] to pursue an action enforcing the Enterprises' rights for reasons other than good-faith business judgment," or that there is a conflict of interest between the managers and the shareholders. *Washington Federal*, 26 F.4th at 1267-68; *see* 149 Fed. Cl at 296-97. The *Washington Federal* plaintiffs demonstrated neither circumstance. *Washington Federal*, 26 F.4th at 1267-68; *see* 149 Fed. Cl. at 296-97. Thus, the plaintiffs also failed to establish standing to bring their derivative claim. *Washington Federal*, 26 F.4th at 1268.

The Federal Circuit also agreed with this court in rejecting the plaintiffs' arguments that the claims were analogous to the direct breach-of-contract claim at issue in *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 603 (D.C. Cir. 2017) (*Perry II*), for which shareholders had standing. *Washington Federal*, 26 F.4th at 1266, 1268-69; *see* 149 Fed. Cl. at 295-96. Although the *Washington Federal* and *Perry II* claims arose from the same 2008 events and concerned similar agreements, the shareholders in *Perry II* sought to enforce the parties' own shareholder contracts and sued their contracting partners—the enterprises—not the conservators. 26 F.4th at 1268-69; *see also* 149 Fed. Cl. at 296. The shareholders' claims in *Perry II* could not plausibly belong to the enterprises, whereas the *Washington Federal* plaintiffs had tried to "enforce the legal rights and interests of the Enterprises." 26 F.4th at 1269. The two cases were not analogous. *Id.* at 1268.

Finally, the Federal Circuit gave an additional rationale not addressed by this court. The *Washington Federal* plaintiffs' takings question had already been settled: Previous, binding cases had already established that enterprise shareholders "cannot assert a cognizable takings claim regarding actions taken in connection with the imposition of the conservatorships in 2008." *Washington Federal*, 26 F.4th at 1265-66. According to the Court, enterprise shareholders do not retain the same degree of property interests in their shares as shareholders of other companies because Congress granted the FHFA unusually broad authority to act as conservator of the enterprises and to act against shareholders' best interests. *Id.* at 1266. Given the exceptional status of the enterprises, enterprise shareholders had no investment-backed expectation that the value of their shares

4

would not be diluted or used for the public's benefit. *Id.* Because the *Washington Federal* plaintiffs could not establish that, as shareholders, they held property interests, they could not establish a taking. *Id.*

        **C.**     **This action**

On October 1, 2021, while the *Washington Federal* appeal was pending, Mr. Kelly filed his complaint in this court. ECF No. 1. Like the *Washington Federal* plaintiffs, Mr. Kelly alleged that the FHFA's conservatorships over the enterprises amounted to a taking or illegal exaction of his financial property. *Id.* at 1 [¶1], 40 [¶B]. Mr. Kelly also alleged that the establishment of the conservatorships constituted a breach of a contract between himself and the government. *Id.* at 1 [¶1], 41 [¶C].

This court stayed Mr. Kelly's action pending a final decision in *Washington Federal*. ECF No. 8. Following the Federal Circuit's decision, the court lifted the stay, and Mr. Kelly filed an amended complaint. ECF No. 30. The amended complaint omits the illegal exaction claim and allegations related to the illegality of the conservatorships, adds facts related to the contract claim, and is designed to better establish Mr. Kelly's standing. ECF No. 25 at 6; *compare* ECF No. 1 *with* ECF No. 30. The government then moved to dismiss the amended complaint. ECF No. 31.[2]

**II.**    **Discussion**

Mr. Kelly seeks compensation for an alleged Fifth Amendment taking of his stock assets and shareholder property rights. ECF No. 30 at 43-57, 67. He also asserts that the government took his right to seek meaningful judicial review. *Id.* at 52 [¶168]. He asserts both direct and derivative takings claims. *Id.* at 4 [¶12]. He also requests damages for an alleged breach of the covenant of good faith and fair dealing and an alleged breach of an implied contract. *Id.* at 58-67. The government moves to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. ECF No. 31; *see* RCFC 12(b)(1), 12(b)(6).

On a motion to dismiss for lack of jurisdiction under this court's rule 12(b)(1), the "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). If the court determines that it lacks subject-matter jurisdiction, it must dismiss the action. RCFC 12(b)(1), (h)(3); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). A "plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014).

This court's jurisdiction is primarily defined by the Tucker Act, which provides the court with exclusive jurisdiction to decide specific types of monetary claims against the United States. *Kanemoto v. Reno*, 41 F.3d 641, 644 (Fed. Cir. 1994); 28 U.S.C. § 1491(a)(1). The Tucker Act provides the court with "jurisdiction to render judgment upon any claim against the United States founded … upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

---

[2] The case was originally assigned to Judge Davis and was transferred to me soon after the government filed its motion to dismiss.

The Takings Clause of the Fifth Amendment of the Constitution provides that "private property [shall not] be taken for public use, without just compensation." A takings claim "is founded upon the Constitution and [is] within the jurisdiction of the Court of [Federal] Claims to hear and determine." *Knick v. Township of Scott*, 588 U.S. 180, 190 (2019) (quotation marks omitted).

A statute of limitations restricts this court's jurisdiction. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008) (maintaining the Supreme Court's longtime interpretation that this court's statute of limitations is "jurisdictional"). "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. For a Fifth Amendment taking, the claim accrues at the time of the taking. *Knick*, 588 U.S. at 190.

On a motion to dismiss for failure to state a claim under rule 12(b)(6), the court must accept well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Lindsay*, 295 F.3d at 1257. The court is not required to accept the parties' legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). "A complaint must be dismissed under Rule 12(b)(6) when the facts asserted do not give rise to a legal remedy, or do not elevate a claim for relief to the realm of plausibility." *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012). A complaint fails to state a claim when every claim, or an issue essential to judgment on each claim, has already been determined by a final judgment in a prior case. *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).

### A.    Mr. Kelly's complaint is barred because *Washington Federal* cannot toll the statute of limitations

The parties do not dispute, for purposes of this motion, that Mr. Kelly's takings claims accrued on September 6, 2008, when the government placed the enterprises into conservatorships. ECF No. 30 at 20 [¶63]; ECF No. 31 at 13-14; ECF No. 33 at 14 & n.3, 22. Under the Tucker Act's statute of limitations, Mr. Kelly had six years, until September 6, 2014, to bring suit. *See* 28 U.S.C. § 2501. Mr. Kelly filed this suit on October 1, 2021, thirteen years after his claims accrued.

Mr. Kelly asserts that his complaint is timely because the limitations period was tolled while *Washington Federal* was pending; he was a putative member of the class of plaintiffs in that case; and thus he reasonably thought he could have his claims resolved there. *Washington Federal* was filed on June 10, 2013—within Mr. Kelly's limitations period—and was dismissed on July 16, 2020. ECF No. 30 at 4. With tolling, he had until October 3, 2021, to file this suit. He filed this suit two days before that deadline. ECF No. 33 at 22.

The government argues that Mr. Kelly's claims cannot be tolled by *Washington Federal*. ECF No. 31 at 13-17. The government asserts that the Supreme Court has clearly established that (1) class-action tolling is equitable in nature; and (2) equity cannot toll the Tucker Act's statute of limitations. *Id.*; ECF No. 40 at 2-7. According to the government, class-action tolling is thus not available, and this court lacks subject-matter jurisdiction over Mr. Kelly's complaint. *Id.*

The government is correct: The Tucker Act's statute of limitations is not subject to class-action tolling. Mr. Kelly's complaint was not tolled by *Washington Federal* and is time barred.

6

The Supreme Court first recognized class-action tolling in *American Pipe* in 1974. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974). The Court held that a timely-filed class-action lawsuit can toll the limitations period for each putative class member's individual claims. The Court reasoned that putative class members are only "passive beneficiaries" of the action until the class is certified. *Id.* at 551-52. Before that, putative class members cannot fully evaluate their own interests. *Id.* And the federal class-action rule, rule 23, was "not designed to afford class action representation only to those who are active participants in or even aware of the proceedings" before a class certification decision. *Id.* at 552. To give meaning and effect to the federal class-action rule, and to preserve putative members' interests, the Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action," from the date of filing until the day the court finds the suit inappropriate for class status. *Id.* at 554; *see id.* at 552-53. When class certification is denied, the statute-of-limitations clock begins to run again for the individual members of the failed class. Each person then has the remaining days under the limitations period to intervene as an individual plaintiff in the action. *Id.* at 561.

Almost a decade later, the Supreme Court extended the tolling rule to potential class members who bring separate individual lawsuits rather than intervening in the original action. *Crown, Cork & Steel Co., Inc. v. Parker*, 462 U.S. 345, 353-54 (1983). To preserve the spirit and objectives of the tolling rule, the Court held that *American Pipe* must also protect those who choose to file their own suits instead of intervening. *Id.* at 350-354. "There are many reasons why a class member, after the denial of class certification, might prefer to bring an individual suit rather than intervene," and a court could deny intervention "for reasons wholly unrelated to the merits." *Id.* at 350. The Court therefore held that a putative class member may also promptly bring an individual lawsuit after the denial of class certification, even where that claim would otherwise be untimely filed. *Id.* That is the type of case Mr. Kelly tried to file.

Here, the parties disagree over whether *American Pipe* tolling—as extended by *Crown, Cork & Steel*—is statutory or equitable in nature and thus whether it is available to toll actions brought in this court. If statutory, yes. If equitable, no.

The Federal Circuit previously applied *American Pipe* tolling to the Tucker Act's statute of limitations, 28 U.S.C. § 2501. In *Bright v. United States*, 603 F.3d 1273, 1274 (Fed. Cir. 2010), the Federal Circuit permitted the existence of a class action to toll section 2501, holding that "when a class action complaint is filed in the Court of Federal Claims and class certification is sought prior to expiration of the section 2501 limitations period, the limitations period is tolled … during the period the court allows potential class members to opt in to the class."

The government asserts, however, that the Supreme Court's decision in *California Public Employees' Retirement System v. ANZ Securities, Inc.*, 582 U.S. 497 (2017) (*CalPERS*) has effectively overruled *Bright*. ECF No. 31 at 14-17; ECF No. 40 at 3-7. According to the government, *Bright* relied on the premise that *American Pipe* tolling was statutory and acknowledged that section 2501 is not subject to equitable tolling. ECF No. 31 at 16; ECF No. 40 at 5. In the government's view, *CalPERS* later resolved that *American Pipe* tolling is in fact equitable. ECF No. 31 at 16-17. Because this court cannot alter the limitations period for equitable considerations, the government argues that no equitable tolling is available. *Id.*; ECF No. 40 at 7.

7

Mr. Kelly responds that *Bright* remains good law in spite of the *CalPERS* decision. ECF No. 33 at 15-17. He criticizes the government for disregarding *Bright's* "nuanced reasoning" and for creating a "bright-line rule prohibiting class action tolling … on *any* Tucker Act claim." *Id.* at 14, 16. Mr. Kelly argues that *American Pipe* tolling is a one-of-a-kind, neither statutory nor equitable, "common law device designed to effectuate Rule 23." *Id.* at 16-17, 17 n.5. Mr. Kelly distinguishes *CalPERS* because it did not examine class-action tolling in the context of this court, its jurisdiction, and its rules.

Essential to *Bright's* analysis is the presumption that *American Pipe* tolling is a statutory rule. *Bright*, 603 F.3d at 1279-80, 1287-88. The Federal Circuit explained that *American Pipe* tolling is "not based on judge-made equitable tolling, but rather on the Court's interpretation of [Federal Rule of Civil Procedure] 23." *Id.* at 1279 (quotation marks omitted). "Having determined that Rule 23 tolling is statutory rather than equitable," the Court explained, "it follows that the rule of *American Pipe* applies to the government just as it does to private parties." *Id.* The opinion was careful to differentiate between statutory tolling and equitable tolling, clarifying that it was addressing only "whether section 2501's limitations period is *non-equitably tolled* [that is, statutorily tolled] for putative members under RCFC 23." *Id.* at 1287 (emphasis added). In contrast, the Federal Circuit reaffirmed that under *John R. Sand & Gravel*, "equitable tolling is barred under section 2501." *Id.* at 1287.

Mr. Kelly is therefore correct that *Bright* distinguished the two forms of tolling—equitable and statutory—but he is incorrect that *Bright* characterized class-action tolling as distinct from either category. Instead, *Bright* held that *American Pipe* tolling is statutory, and its reasoning hinges on that categorization. *Bright*, 603 F.3d at 1285-88. Because the Federal Circuit understood *American Pipe* tolling to be statutory, and not equitable, it held that a class action could toll section 2501. *Id.* at 1287-88.

But now the Supreme Court has held that *American Pipe* tolling is equitable, not statutory. *CalPERS*, 582 U.S. at 509-510. "[T]he source of the tolling rules applied in *American Pipe* is the judicial power to promote equity, rather than to interpret and enforce statutory provisions." *Id.* *CalPERS* thus undermines *Bright's* logical premise. This court cannot toll the Tucker Act's statute of limitations for a class action.[3]

Earlier Supreme Court decisions, including *American Pipe* itself, were ambiguous on the statutory-versus-equitable question. *See CalPERS*, 582 U.S. at 510; *see also American Pipe*, 414

---

[3] This court "may not disregard its reviewing court's precedent," such as *Bright*. *Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005). But there is a narrow exception, when that "precedent is expressly overruled … by a subsequent Supreme Court decision." *Id.* The Federal Circuit follows the same rule when deciding whether a panel must follow an earlier panel decision. *Texas Am. Oil Corp. v. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995). If the Supreme Court has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable," "[i]t is established that a later panel can recognize that the court's earlier decision has been implicitly overruled as inconsistent with intervening Supreme Court authority." *Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) (quotation marks omitted). The same must be true for a trial court looking at Federal Circuit and Supreme Court authority that interact in the same way.

U.S. at 558 (referring to the class-action tolling rule as arising from "judicial power," which sounds more equitable than statutory, but not elaborating). But in *CalPERS*, the Supreme Court was clear: "Nothing in the *American Pipe* opinion suggests that the tolling rule it created was mandated by the text of statute or federal rule. Nor could it have." 582 U.S. at 509. *American Pipe* tolling, the Court clarified, is firmly "grounded in the traditional equitable powers of the judiciary." *Id* at 508-10. *American Pipe's* "reasoning … reveals a rule based on traditional equitable powers, designed to modify a statutory time bar where its rigid application would create injustice." *Id.* at 510. Because *American Pipe* tolling is equitable, the Court concluded that it could not toll the time-bar statute at issue in *CalPERS* because "the text, purpose, structure, and history of [that] statute all disclose the congressional purpose to offer defendants full and final security" after a set number of years. 582 U.S. at 510-11.

Since *CalPERS*, the Supreme Court has reaffirmed its understanding that *American Pipe* tolling is an equitable rule. *See China Agritech, Inc. v. Resh*, 584 U.S. 732, 743, 745 (2018). Although the Federal Circuit has not had occasion to address the issue after *CalPERS*, other courts of appeals have followed the Supreme Court's reasoning. *See, e.g.*, *Testa v. Becker*, 910 F.3d 677, 683-84 (2d Cir. 2018); *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 609 (3d Cir. 2018); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 854 Fed. App'x 570, 572 (5th Cir. 2021) (unpublished); *Potter v. Comm'r of Soc. Sec.*, 9 F.4th 369, 371 (6th Cir. 2021); *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 742 (7th Cir. 2018).

Mr. Kelly attempts to limit the *CalPERS* holding to statutes of repose, which are more absolute than statutes of limitations. ECF No. 33 at 17. He is correct that *CalPERS* addressed a statute of repose (582 U.S. at 516) and that a statute of repose is more absolute, displacing "the traditional power of courts to modify statutory time limits in the name of equity" (*id.* at 510, 516). And consistent "with the different purposes embodied in statutes of limitations and statutes of repose," statutes of limitations are generally more amenable to equitable tolling than statutes of repose. *Id.* at 511-12. Complicating the matter, "Congress has used the term 'statute of limitations' when enacting statutes of repose" and vice versa. *CTS Corp. v. Waldburger*, 573 U.S. 1, 13 (2014).

To determine whether a tolling rule applies, the Supreme Court looks not at the label but instead at the statute's "text, purpose, structure, and history" (*CalPERS*, 582 U.S. at 510-11), and whether the statute is "fundamentally incompatible" with the principles of equitable tolling (*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991)). Tolling is impermissible where Congress has indicated that the statutory period is an absolute bar. *CalPERS*, 582 U.S. at 507-508; *see also CTS Corp.*, 573 U.S. at 8-9; *Lampf*, 501 U.S. at 363 (overruled in part by statute); *Weddel v. Sec'y of Health and Hum. Servs.*, 100 F.3d 929, 931-32 (Fed. Cir. 1996).

The Supreme Court in *CalPERS* reviewed the terms, structure, and legislative history of the time bar at issue there and determined it to be an absolute time bar, thus classifying it as a statute of repose. 582 U.S. at 505-06. The Court then held the purpose of that statute to be incompatible with tolling principles. *Id.* at 510.

While there are distinctions between statutes of limitations and statutes of repose, section 2501 is an unusual type of statute of limitations. As the Supreme Court held in *John R. Sand & Gravel*, it has long been established that section 2501 is "more absolute" than the typical statute of limitations. 552 U.S. at 133-36. Often referred to as a "jurisdictional" statute, section 2501

9

requires this "court to decide a timeliness question despite a waiver" and forbids it from considering "whether certain equitable considerations warrant extending a limitations period." *Id.* at 133-34; *see FloorPro, Inc. v. United States*, 680 F.3d 1377, 1382 (Fed. Cir. 2012). It is "not susceptible to equitable tolling." *John R. Sand & Gravel*, 552 U.S. at 136.

In contrast to the typical statute of limitations, the primary goal of jurisdictional statutes is not to ensure the timeliness of claims. *John R. Sand & Gravel*, 552 U.S. at 133. Instead, these statutes are designed "to achieve a broader system-related goal, such as facilitating the administration of claims" and "limiting the scope of a governmental waiver of sovereign immunity." *Id.* at 133; *see generally United States v. Wong*, 575 U.S. 402, 408-09 (2015).

In essence, then, section 2501 is more akin to a statute of repose than a statute of limitations. *See Hart v. United States*, 910 F.2d 815, 817-19 (Fed. Cir. 1990) (categorizing the section 2501 "as a statute of repose" and holding that because it is "jurisdictional in nature and, as an express limitation on the waiver of sovereign immunity," it "may not be waived," and courts "are not free to engraft exceptions" onto it). Like the statute of repose examined in *CalPERS*, section 2501 is thus an absolute bar that "supersedes the application of a tolling rule based in equity." *CalPERS*, 582 U.S. at 510.

It has long been settled that equitable considerations may not extend the statute of limitations for this court. *John R. Sand & Gravel*, 552 U.S. at 133-34. *Bright* affirms that holding, reiterating that "equitable tolling is barred under section 2501." 603 F.3d at 1287. *Bright* was mistaken only as to the nature of *American Pipe* tolling. Now that the Supreme Court has resolved that *American Pipe* tolling is equitable, *Bright*, were it decided today, would have to come out the opposite way.

Mr. Kelly distinguishes *CalPERS* for examining the tolling question in the context of an opt-out, rather than opt-in, class action. ECF No. 33 at 16-17. He is correct that the rules of this court permit only opt-in class actions. *See Bright*, 603 F.3d at 1277 & n.1. Parties in other cases have argued a similar distinction, but neither *Bright* nor *CalPERS* distinguishes opt-in from opt-out class actions for purposes of whether class-action tolling applies to section 2501. *Bright*, 603 F.3d at 1284-85; *see generally CalPERS*, 582 U.S. at 512. The distinction is irrelevant here.

Finally, Mr. Kelly raises this court's 2022 decision in *Birdbear v. United States*, 162 Fed. Cl. 225 (2022), in which the court applied *American Pipe* tolling rule to section 2501. ECF No. 33 at 15. *Birdbear* does not undermine the court's conclusion today. The parties in *Birdbear* did not argue that *Bright* might have been overruled (*see Birdbear v. United States*, No. 16-75L, ECF No. 187 at 3, 35 and ECF No. 191 at 12-13), and *Birdbear* does not cite *CalPERS*, instead relying only on *American Pipe* and *Bright.* 162 Fed. Cl. at 242. The decision does not provide any guidance on how to reconcile *Bright* and *CalPERS*. Regardless, prior decisions of the Court of Federal Claims, "while persuasive, do not set binding precedent for separate and distinct cases." *W. Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (Fed. Cir. 1994).

In sum, the Supreme Court's holding in *CalPERS* undermines *Bright*. *American Pipe* tolling is equitable, not statutory, and equitable considerations cannot alter the statute of limitations

in section 2501. Thus, *American Pipe* tolling is unavailable to Mr. Kelly here. Because the statute of limitations has not been tolled, Mr. Kelly's complaint is time barred.[4]

### B.     Even if Mr. Kelly's complaint were timely, it fails to state a claim

Even if it were timely, Mr. Kelly's complaint must alternatively be dismissed because it fails to state a claim on which relief may be granted for any of its five counts. *See* RCFC 12(b)(6). As a matter of law, as a shareholder, Mr. Kelly is precluded from bringing either the direct or derivative takings claims he asserts. In *Washington Federal*, the Federal Circuit already determined that nearly identical claims, brought by the same type of plaintiff, arising from the same transactional facts, failed on the merits. Even if Mr. Kelly's takings claims were not barred under the formal claim- and issue-preclusion doctrines, the same issues have already been decided in a Federal Circuit decision that is binding on this court. Mr. Kelly also fails to establish the existence of an implied covenant or implied contract with the government.

#### 1.     Claim preclusion bars Mr. Kelly's takings claims

The government argues that, were this court to have jurisdiction over Mr. Kelly's claims, claim preclusion bars his takings claims. ECF No. 31 at 3-4; ECF No. 40 at 12-19; ECF No. 47 at 28:10-19 (hearing transcript, stating that both claim and issue preclusion apply to various aspects of Mr. Kelly's case but that claim preclusion bars the takings claims). According to the government, Mr. Kelly's case is substantially identical to *Washington Federal*: Both concern the same parties, enterprise shareholders; both arise from the same transactional set of facts, the government imposing conservatorships; and both allege that imposing the conservatorships diminished their stock value. ECF No. 31 at 29-31.

Mr. Kelly responds that his "is a very different case with very different claims," arising from different sets of transactional facts, than *Washington Federal*. ECF No. 33 at 4, 22-42. According to Mr. Kelly, his takings claims concern a compensable property interest: "the investment-backed expectations of banks that were induced to invest their critical Tier 1 Capital Reserves in the [enterprises] and then lost those reserves" (ECF No. 33 at 25) "when the conservatorship was imposed" (*id.* at 38). According to Mr. Kelly, *Washington Federal* concerned only the reduced stock value resulting from the government imposing the same conservatorships. *Id.* at 24. He also argues that *Washington Federal* relied on the idea that the government acted unlawfully when it imposed the conservatorships, whereas his claims are "agnostic" on the lawfulness of that conduct. *Id.* at 22-24; *see also* ECF No. 47 at 60:9-61:20. Finally, he argues that *Washington Federal* does not preclude his derivative takings claims because the plaintiffs in that case alleged only direct, not derivative, takings claims. ECF No. 33 at 39.

---

[4] Because the court holds, as a general matter, that *American Pipe* tolling cannot be applied to section 2501, this decision need not address two of the government's alternative arguments. ECF No. 31 at 17-23; ECF No. 40 at 7-12. The court need not address whether tolling would otherwise be prohibited because the plaintiffs in *Washington Federal* never moved to certify the class within the statutory window, a question that *Bright* left open (603 F.3d at 1290 n.9). And the court need not separately address whether Mr. Kelly's breach-of-implied-covenant and breach-of-implied-contract claims could be tolled by *Washington Federal*.

Mr. Kelly's takings claims are precluded by *Washington Federal*. Under the doctrine of claim preclusion, a final judgment on the merits "forecloses successive litigation of the very same claim" by the same party or its privies, "whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire*, 532 U.S. at 748 (quotation marks omitted). To be precluded, the later claim must arise from the same set of transactional facts as the first, such that the later claim could have and should have already been litigated. *Bowers Inv. Co., LLC v. United States*, 695 F.3d 1380, 1384 (Fed. Cir. 2012). The *Washington Federal* decision and Mr. Kelly's takings claims concern the same set of transactional facts and involve the same parties.

Whether two claims involve the same transactional facts is determined "pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Phillips/May Corp. v. United States,* 524 F.3d 1264, 1271 (Fed. Cir. 2008) (quoting Restatement (Second) of Judgments § 24(2) (1982)).

Mr. Kelly's takings claims, like those in *Washington Federal*, arise from the government's placing the enterprises into conservatorships and are based on his status as an enterprise stock shareholder. *Compare* ECF No. 30 at 2 [¶¶5-6] *with Washington Federal*, 26 F.4th at 1260-61, 1265. The plaintiffs in *Washington Federal* alleged that, by imposing the conservatorships during the 2008 financial crisis, the government destroyed the value of their enterprise stock shares and nullified the rights and benefits of those shares, which amounted to a taking. *Washington Federal*, 26 F.4th at 1260-62, 1265. Mr. Kelly likewise alleges that when the government put the enterprises into conservatorships during the 2008 financial crisis, the government "took for a public use the rights, protections, and duties that adhered to the ownership of the [enterprises'] preferred shares," drastically devaluing shareholders' investments, which amounted to a taking. ECF No. 30 at 2 [¶¶5-6], 34 [¶101]. Both are traceable to the FHFA's imposing the conservatorships under the authority of the Recovery Act in 2008. *Compare Washington Federal*, 26 F.4th at 1262 *with* ECF No. 30 at 34 [¶101], 52 [¶171].

The court is unpersuaded by Mr. Kelly's distinction between *Washington Federal*—which alleged that the FHFA's conduct was unlawful—and his amended claims—which are "agnostic" on that lawfulness. *See* ECF No. 33 at 22-24. Although the *Washington Federal* plaintiffs alleged unlawfulness, the Federal Circuit analyzed the takings claims as if the government's imposing the conservatorships had been lawful (26 F.4th at 1266) because a valid takings claim requires that the taking "be premised upon a government action that is either expressly or impliedly authorized by a valid enactment of Congress" (*Dureiko v. United States*, 209 F.3d 1345, 1359 (Fed. Cir. 2000)). Because "an uncompensated taking and an unlawful agency action constitute separate wrongs that give rise to separate causes of action," the *Washington Federal* plaintiffs could only litigate their takings claims "on the assumption that the FHFA's appointment as conservator was lawful." 26 F.4th at 1263-64, 1266. The court therefore determined only "whether, upon lawful imposition of the conservatorships, the shareholders retained any investment-backed expectation that the value of their shares would not be diluted and the rights otherwise attendant to share ownership would not be temporarily suspended." *Id.* at 1266.

Mr. Kelly's distinction between direct and derivative takings claims is also immaterial for claim-preclusion purposes. *See* ECF No. 33 at 39. Claim identity is not required for preclusion to apply; the claims need only concern the same operative facts. *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 316 (2011); *Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1567 (Fed. Cir. 1988). Irrespective of the label, the takings claims in *Washington Federal* "rest[ed] on the expropriation of the Washington Federal Plaintiffs' economic interests and property rights as shareholders." 26 F.4th at 1262. Same with Mr. Kelly's takings claims. ECF No. 30 at 41 [¶135], 47-48 [¶152], 55 [¶154]; ECF No. 33 at 37. Mr. Kelly presents a different theory based on the same facts. ECF No. 33 at 36-39*; see generally* ECF No. 30. But the "bar to subsequent litigation applies 'even though the plaintiff is prepared in the second action to present evidence or grounds or theories of the case not presented in the first action.' Different legal theories do not create separate claims for res judicata purposes even though 'the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief.'" *Resource Investments, Inc. v. United States*, 785 F.3d 660, 667 (Fed. Cir. 2015) (cleaned up, quoting Restatement (2d) of Judgments § 25, § 24 cmt. c (1982)); *see id.* at 664-668.

Regardless, *Washington Federal* addresses derivative claims. The *Washington Federal* plaintiffs called their takings claims "direct." 26 F.4th at 1267. But the Federal Circuit reasoned that the so-called "direct" claims were substantively derivative because the "alleged injuries [were] not independent of alleged harms to the Enterprises," as the shareholders' injury of diminution in share value "flowed from the injury to the Enterprises" when the government established the conservatorships. *Id.* at 1268; *see also id.* at 1269. The Court then analyzed the takings claims as derivative claims, and its holding—that enterprise shareholders lack a cognizable property interest in enterprise stock and lack standing to bring derivative shareholder actions on behalf of the enterprises (*id.*at 1265-70)—is a judgment on the merits regarding derivative taking claims. *See id.* at 1267-68.

Regarding the same-party analysis, although Mr. Kelly was not a named plaintiff in *Washington Federal*, he was in privity with the *Washington Federal* plaintiffs for claim-preclusion purposes.

In shareholder derivative class actions and putative class actions like *Washington Federal*, courts treat nonparty shareholders of the same corporation, and the corporation itself, as in privity for claim-preclusion purposes. Restatement (Second) of Judgments § 59(2) (1982) ("The judgment in an action to which the corporation is a party is binding under the rules of res judicata [or claim preclusion] in a subsequent action by its stockholders or members suing derivatively in behalf of the corporation, and the judgment in a derivative action by its stockholders or members is binding on the corporation."); *Cottrell v. Duke*, 737 F.3d 1238, 1243 (8th Cir. 2013) ("Under Delaware law, a judgment rendered in a shareholder-derivative lawsuit will preclude subsequent litigation by the corporation and its shareholders."); *Nathan v. Rowan*, 651 F.2d 1223, 1226 (6th Cir. 1981) ("parties and their privies include the corporation and all nonparty shareholders"); *Stella v. Kaiser*, 218 F.2d 64, 65, 68 (2d Cir. 1954). Because a derivative claim brought by a shareholder belongs not to that shareholder, but to the corporation, the corporation "is the real party in interest" and "is bound by the result of the suit." *Ross v. Bernhard*, 396 U.S. 531, 538 (1970). The corporation and any shareholders wishing to bring a later derivative action are bound by the judgment "even if

13

different shareholders prosecute the suits," as long as the first shareholder "fairly and adequately represent[s] the corporation." *In re Sonus Networks, Inc, Shareholder Derivative Litig.*, 499 F.3d 47, 64 (1st Cir. 2007). Thus, the real parties in interest in both this case and *Washington Federal* are the enterprises.

To avoid claim preclusion, Mr. Kelly argues that community banks that placed their tier one capital in the enterprises, like his, were not represented in *Washington Federal*. ECF No. 33 at 38. But for purposes of his tolling argument, Mr. Kelly argued that he qualified as a putative class member in that same action. *Id.* at 14 (asserting that the *Washington Federal* class action tolled "a putative plaintiff's," meaning his, "individual claims"); *see also id.* at 11 (noting that the proposed classes in *Washington Federal* "included pre-conservatorship shareholders of both common and preferred stock of the" enterprises). It is hard to imagine a scenario in which Mr. Kelly could simultaneously be a putative class member to benefit from tolling and distinct enough from that putative class to avoid preclusion.

### 2. Binding precedent holds that Mr. Kelly fails to state a takings claim

Even if formal claim preclusion did not bar Mr. Kelly's takings claims, the binding *Washington Federal* precedent would still require dismissing his case. To plead a taking, Mr. Kelly must establish (1) that he held a legally cognizable property interest at the time of the taking, and (2) that the government's actions amounted to a compensable taking of that property interest. *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). Mr. Kelly cannot establish either element. First, *Washington Federal* held that enterprise shareholders, such as Mr. Kelly, do not have a cognizable property interest in their shares of enterprise stock. 26 F.4th at 1266. Second, *Washington Federal* also held that the government's imposing the conservatorships in 2008 did not amount to a taking. *Id.* Beyond those two defects, the Federal Circuit held that enterprise shareholders, like Mr. Kelly, lack standing under the prudential standing doctrine to bring takings claims. *Id.* 1267-70.

On the first prong, the Federal Circuit has established that enterprise shareholders do not have cognizable investment-backed expectations and property rights under the Recovery Act. In *Washington Federal*, the Federal Circuit held that, given the unique nature of the enterprises and the unusually broad authority the Recovery Act granted the FHFA over the enterprises, enterprise shareholders did not retain "any investment-backed expectation that the value of their shares would not be diluted and rights otherwise attendant to share ownership would not be temporarily suspended" when the government imposed the conservatorship. *Washington Federal*, 26 F.4th at 1266 (citing *Collins*, 141 S. Ct. 1761 and *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274 (Fed. Cir. 2022)). "Under [the Recovery Act], the FHFA may act in ways that are *not* in the best interests of the Enterprises or the shareholders, and, instead, are beneficial to the [agency] and the public it serves." *Id.* "Where shareholders hold shares in such highly regulated entities—entities that the government has the authority to place into conservatorship—where the conservator's powers are extremely broad, and where the entities were lawfully placed into such a conservatorship," the Court reasoned, "shareholders lack a cognizable property interest in the context of a takings claim." *Id.* at 1266; *see id.* at 1266 n.9. The same goes for Mr. Kelly. As a shareholder of the same highly regulated enterprises, Mr. Kelly does not have investment-backed expectations or property rights in the value of his shares in the enterprises.

14

On the second prong, the *Washington Federal* plaintiffs could not show that the government's actions could amount to a taking. 26 F.4th at 1266 & n.9. As the Court explained, shareholders cannot allege takings "regarding actions taken in connection with the imposition of the conservatorships in 2008." *Id.* at 1266. Likewise for Mr. Kelly; given the government's statutorily mandated authority, even if its actions were not in the best interests of the enterprises or its shareholders, the government's actions cannot amount to a taking.

In addition, as in *Washington Federal*, Mr. Kelly is not in a position to bring his takings claims under the prudential standing doctrine. The "prudential standing rule … normally bars litigants from asserting the rights or legal interests of others in order to obtain relied from injury to themselves." *Warth v. Seldin*, 422 U.S. 490, 509 (1975). Under the related shareholder standing rule, shareholders injured as a result of their ownership in a corporation generally lack standing to bring a direct action enforcing the rights of the corporation; only the corporation has a direct interest to enforce its own rights. *Washington Federal*, 26 F.4th at 1267 (relying on *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990), and *Starr Int'l Co. v. United States*, 856 F.3d 953, 966 (Fed. Cir. 2017)). If a shareholder has suffered a harm independent of the harm to the corporation, he has distinct personal rights and may assert a direct claim, even if the corporation's rights are also implicated. *Id.* at 1267-70; *cf. Franchise Tax Bd.*, 493 U.S. at 336-37 (determining that the plaintiffs' claims fell within this exception, where they alleged injuries independent of their status as shareholders). But "when the alleged harm to the corporation and alleged harm to the shareholder are not independent, the claim is only substantively derivative in nature." *Washington Federal*, 26 F.4th at 1269.

Mr. Kelly's allegedly direct takings claims are substantively identical to the allegedly direct takings claims in *Washington Federal*, which the Federal Circuit held to be derivative. *See supra* part II.B.1. Mr. Kelly alleges that the stock price of his investments in the enterprises "plummeted" as a direct result of the "nationalization" of the enterprises through the government's imposing the conservatorship. ECF No. 30 at 2 [¶6]. So too did the *Washington Federal* plaintiffs. 26 F.4th at 1268 (plaintiffs alleged, "as a result of the Government's … imposition of the conservatorships" the value of their shares to "plummet[ed], … destroying all shareholder rights and property interests" and constituting a taking). Like the *Washington Federal* plaintiffs, whose injury "flowed from the injury to the Enterprises" when the government established the conservatorships (26 F.4th at 1268), Mr. Kelly alleges that his injury was the "direct result" of the government imposing the enterprise conservatorships (ECF No. 30). Those takings claims must be asserted derivatively. *Washington Federal*, 26 F.4th at 1267-68. Only the enterprises may litigate the enterprises' harms, even if a shareholder like Mr. Kelly suffers a secondary harm resulting from the same government actions. *Id.* at 1267-70. Mr. Kelly thus lacks standing under the prudential standing doctrine to assert his allegedly direct takings claims.

Mr. Kelly also cannot, under the shareholder standing rule, assert any of his derivative takings claims. A shareholder may bring a derivative action only when the corporation refuses to enforce its own rights for reasons other than good-faith business judgment. *Washington Federal*, 26 F.4th at 1268; *Ross*, 396 U.S. at 534. Mr. Kelly does not allege that the enterprises used other than good-faith business judgment in declining to enforce their own rights. *See generally* ECF No. 30. Like the *Washington Federal* plaintiffs, Mr. Kelly lacks standing under the prudential standing doctrine to assert his derivative takings claims.

15

There is a limited conflict-of-interest exception to the rule about derivative claims. *First Hartford Corp.*, 194 F.3d at 1295 (holding that where "a government contractor with a putative claim of breach by a federal agency was being operated by that very same federal agency," there was a conflict of interest that warranted shareholder standing to bring a derivative action). But here, as the D.C. Circuit has explained, the Recovery Act's succession clause (12 U.S.C. § 4617(b)(2)(A)(i)) does not allow for a conflict-of-interest exception. *Perry II*, 864 F.3d at 623-28; *accord Roberts v. Fed. Hous. Fin. Agency*, 889 F.3d 397, 409-410 (7th Cir. 2018). While the Federal Circuit has not supplied any precedent on the conflict-of-interest exception in this situation, it briefly discussed the issue in *Fairholme Funds*, 26 F.4th at 1302-03 & n. 13. There, this court had relied on the conflict-of-interest exception. The Federal Circuit reversed on other grounds. But the Federal Circuit distinguished *Collins* and *Perry II*, on one hand, from *First Hartford*, on the other, noting that under both *Collins* and *Perry II*, the Recovery Act requires the government to consider the best interests of only the FHFA and the enterprises, not enterprise shareholders. The statute at issue in *First Hartford*, on the other hand, permitted the government to consider depositors' interests in conservatorship judgments. Given that distinction, it makes sense that, as the D.C. Circuit held, there is no conflict-of-interest exception for claims under the Recovery Act.[5]

### 3. Mr. Kelly fails to state a claim for breach of an implied covenant or implied contract

Mr. Kelly also has not established that he had implied contracts with the government, so his complaint does not state a claim for breach of covenant or breach of implied regulatory contract.

To show that there was an implied-in-fact contract, Mr. Kelly must provide facts that clearly indicate (1) a mutual intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) in an alleged contract involving the government, a government representative whose conduct is relied upon who has actual authority to bind the government in contract. *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). Implied contracts, "founded upon a meeting of minds," require conduct "showing, in the light of the surrounding circumstances, [the

---

[5] Congress created a specific review process for challenging the FHFA's conduct in imposing the conservatorships. *Washington Federal*, 26 F.4th at 1265-66. The Recovery Act gave the enterprises the authority to seek review in a district court within 30 days. 12 U.S.C. § 4617(a)(5). The Recovery Act governs the conservatorships that Mr. Kelly opposes. A party generally cannot circumvent a congressionally prescribed review process to challenge the government's unlawful conduct by bringing a takings claim in this court. *See generally Washington Federal*, 26 F.4th at 1265-66. It may be that, even apart from his standing to sue, Mr. Kelly cannot circumvent the statutorily prescribed review scheme through a suit in this court. *See Pregis Corp. v. Kappos*, 700 F.3d 1348, 1358-59 (Fed. Cir. 2012) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of certain persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded," and allowing collateral attacks would "destroy the [statute's] careful framework for judicial review at the behest of particular persons through particular procedures." (quotation marks omitted)).

parties'] tacit understanding." *Baltimore & O.R. Co. v. United States*, 261 U.S. 592, 597 (1923). There is a particularly high bar to establish implied regulatory contracts with the government because the legislature's principal function "is not to make contracts, but to make laws that establish the policy of the state." *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624, 630 (Fed. Cir. 2012). Thus, there is a strong presumption against finding a contract absent clear legislative intent that the government wishes to bind itself. *Id.* An "agency's performance of its regulatory or sovereign functions does not create contractual obligations." *Mola Dev. Corp. v. United States*, 516 F.3d 1370, 1378 (Fed. Cir. 2008).

Mr. Kelly argues that government incentives induced him to invest his tier one capital in the enterprises and that the government promised that those investments were secured and guaranteed by the government, amounting to an implied contract between him and the government. ECF No. 33 at 42-49; ECF No. 47 at 61:23-63:25. He also argues that an implied contract exists based on the enterprises' bylaws and shareholders' investments. ECF No. 30 at 58 [¶195]; ECF No. 33 at 42-46. The government became a party to this contract, he argues, when the FHFA took on the role as conservator, stepping into the shoes of the enterprise. ECF No. 30 at 58 [¶195]; ECF No. 33 at 42-49.

Regulatory incentives encouraging shareholders like Mr. Kelly to buy enterprise stock, and government statements that shareholders' investments were safe, do not amount to contractual promises. Instead, they are the government acting as regulator. *Mola Dev. Corp.*, 516 F.3d at 1378. Those statements embody government policies designed to encourage investment in the enterprises "to support and accomplish the recapitalization goals of the [enterprises] under the 2006 Consent Agreements." ECF No. 30 at 9 [¶33]. Nothing shows a government intent to contract, an offer and acceptance, or any commitment to compensating shareholders if investment values decline. In fact, the Recovery Act disclaims any guarantees for shareholders' investments in the enterprises. 12 U.S.C. § 4501(4) ("[N]either the enterprises … nor any securities or obligations issued by the enterprises … are backed by the full faith and credit of the United States."); 12 U.S.C. § 4503 ("This chapter may not be construed as implying that any such enterprise … or any obligations or securities of such an enterprise … are backed by the full faith and credit of the United States."). Mr. Kelly's allegations do not establish an implied contract with the government.

Even if there were a contract, "[a]s a general rule, for purposes of Tucker Act jurisdiction, the government consents to be sued only by those with whom it has privity of contract." *Fairholme Funds*, 26 F.4th at 1294. The government is correct that Mr. Kelly cannot show that the government is a party to any contract with him, as required. In *Fairholme Funds*, an enterprise shareholder argued that, when the FHFA imposed the conservatorships, the agency became a party to the contractual rights and obligations derived from enterprise stock certificates. 26 F.4th at 1294-95. Rejecting that theory, the Federal Circuit reasoned that, when the FHFA acted as a conservator, it was not engaged in government activity and thus lost its federal character. *Id.* at 1294-96. The FHFA therefore could not be held to be a party to that contract and could not be sued for breach of contract. *Id.* at 1295-96; *see Perry II*, 864 F.3d 591.

Mr. Kelly's theory is nearly identical to that of the *Fairholme Funds* plaintiffs. He argues that by imposing the conservatorship, the government took over the enterprises' rights and obligations, making the government a party to the contract. ECF No. 30 at 2-3 [¶7], 58-59 [¶¶195-97]. Like those plaintiffs, Mr. Kelly cannot establish that the government is a party to the alleged

contract he seeks to enforce because the FHFA was not acting in its governmental capacity when it took over the enterprises' rights and obligations via the conservatorships.

In sum, Mr. Kelly fails to allege the facts necessary to assert his implied covenant or breach-of-contract claims against the government arising from the government imposing the conservatorships in 2008.

### III. Conclusion

This court **grants** the government's motion to dismiss and **dismisses** Mr. Kelly's amended complaint. The Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Molly R. Silfen
MOLLY R. SILFEN
Judge